Lawrence P. House, California Bar no. 139144
LAW OFFICE OF LAWRENCE P. HOUSE
1445 E. Los Angeles Avenue, Suite 301U
Simi Valley, California 93065
Telephone: 805.501.6293
email: lphouse@hotmail.com

Attorneys for Plaintiff
GET AFTER IT MEDIA, INC. and
KEITH STEGALL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GET AFTER IT MEDIA, INC. and KEITH STEGALL,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT J. ALLEY, and Does 1 through 5,<br><br>Defendant. | CASE NO.<br><br>COMPLAINT FOR DAMAGES FOR COPYRIGHT INFRINGEMENT, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Get After It Media, Inc. (at times, "GAIM") and Keith Stegall allege as follows:

JURISDICTION AND VENUE

1. This court has original jurisdiction of this action under 17 U.S.C. section 501(a) and that venue in the Central District of the United States District Court of California is proper in that, under 28 U.S.C. section 1400, Plaintiff GAIM has sustained, within this forum and venue, the damages alleged herein, as a result of the acts and events alleged herein.

///

///

///

## GENERAL ALLEGATIONS

2. Plaintiff GAIM is, and at all times herein relevant has been, a corporation formed and existing under the laws of the State of Tennessee. Since the outbreak of the Covid pandemic in 2020, California, Plaintiff GAIM has been controlled, operated and administered from its offices in Los Angeles, California.

3. Plaintiff Keith Stegall is one of music's most celebrated artists working behind the scenes. Plaintiff Stegall's accomplishments include multiple CMA, ACM and Grammy awards. As a songwriter and producer, Plaintiff Stegall has had and contributed to, as of this writing, 54 no. 1 hits, he can boast of 25 platinum albums and has sold, and contributed to the sale of, over 60 million records. As a developer of talent, Plaintiff Stegall headed Mercury Records' Nashville's A&R Department In addition to his own body of work, Plaintiff Stegall has worked with Helen Reddy, The Commodores, Johnny Mathis, Randy Travis, George Jones, and other luminaries within the music industry.

4. Plaintiff is informed, believes and thereupon alleges that Defendant Robert Alley, also known as "Dak" Alley, is a resident of the town of Spring Hill, Tennessee.

5. Plaintiff is unaware of the true names and capacities of the fictitiously-named Defendants sued herein as Does 1 through 10. Plaintiff is informed, believes and thereupon alleges that each of the Defendants sued under those fictitious names is responsible in part for the injuries and damages herein alleged.

## FIRST CLAIM FOR RELIEF

(By Plaintiffs GAIM and Keith Stegall, For Copyright Infringement, Against All Defendants)

6. Plaintiff incorporates by reference herein, each and every allegation asserted within paragraph nos. 1 through 5, above.

7. The theft of the fruits of others within the entertainment industry has become its own cottage industry. Its perpetrators pillage the labor of unknown, or lesser-known, creators, while unapologetically exploiting such work as their own. The flagrant pilfering of intellectual property

belonging to the creators of that property is probably nowhere more abundant than within the musical recording industry and Nashville is considered by many to be "Music City." It is there where the creative efforts of musical artists are often absconded by those who are avaricious, greedy and jealous. This is one such instance of blatant copying of the creative efforts of others, here, Plaintiff, by the talentless and jealous, here, the Defendants.

8. Plaintiff is and at all relevant times has been the owner and holder of certain intellectual property and related rights associated with media, television programing and film content ("Content"), which it has either created or acquired at significant expense. Among the projects which Plaintiff GAIM has developed is the show "High Dollar Hill" (the "Show"), which Plaintiff produces for the Heartland Network and broadcast to their viewers via satellite and/or cable.

9. It was during the summer of 2024 that Plaintiff Stegall came up with the idea for the Show. As envisioned, the Show would be centered around Plaintiff Stegall conducting interviews of many of the successful writers and performers within the music industry in Nashville, as well as people working in essential positions behind the scenes. Ultimately, Plaintiff Stegall formed an entity, "High Dollar Hill," to assist him in developing the Show.

10. Also during the summer of 2024, Plaintiff's principal, Joel Wertman, was approached by a mutual colleague about Plaintiff Stegall's concept for the Show and Mr. Wertman was asked whether he was interested in developing Plaintiff Stegall's concept into a show. Ultimately, Mr. Wertman met with Plaintiff Stegall and, thereafter, GAIM entered into an agreement with Plaintiff Stegall's company, High Dollar Hill, to develop and exploit the Show.

11. Plaintiff Stegall has known Defendant Alley for approximately ten years, having worked with him on various prior projects. Because Plaintiff Stegall had previously worked with Defendant Alley and Plaintiff Stegall knew that Defendant Alley already had a lot of equipment, such as microphones, cameras, cables, *etc.*, which Plaintiff would need to assist in the production of the Show, Defendant was ultimately able to insinuate himself into working on the Show.

12. As is standard within the industry, Plaintiff obtained from Defendant an agreement (the "Release Agreement"), whereby Plaintiff allowed Defendant Alley to be present on the premises

during filming of the Show. Pursuant to that Release Agreement, Defendant Alley expressly released, waived and holds Plaintiff, its agents and counsel, of "any and all claims" against Plaintiff which Defendant Alley possessed at that time. The Release Agreement does not operate to create a partnership, agency relationship or joint venture between Plaintiff and Alley, nor between Plaintiff Stegall and Defendant Alley. Further, the Release Agreement does not operate to convey to Defendants any interest in any property, whether tangible, intangible, real property or personal, belonging to Plaintiff GAIM. Moreover, Plaintiff's contract with Dollar Hill expressly provides that "all content derived from" the Show "is owned and copyrighted exclusively by The Heartland Network and its holding company Get After It Media."

13. Shortly after his initial meeting with Shane Perel-Wertman, Defendant Alley began interacting with the crew that Plaintiff had hired to assist in the Show's production. Defendant Alley was present on the Show' set because he had previously worked with Plaintiff Stegall and he appeared to have some of the equipment that Plaintiff was going to need for the Show. From the outset, it was apparent that Defendant Alley was going to be a problem, because he was continuously attempting to insinuate himself into the Show and as someone more than merely an equipment provider. For example, after the first zoom call, Defendant Alley expressed his "vision for the Show" and how "we," meaning Defendant and Plaintiff's executive officer, Shane Perel-Wertman, "would be working together." Also, after Defendant Alley had been introduced to the project's members, Mr. Perel-Wertman was advised not to engage with Defendant Alley. When Wertman did speak with him, Defendant quickly began to pitch a book/series he claimed to have written. After that conversation, Mr. Perel-Wertman was told by another member of the project that Defendant was not to be consulted on anything to do with the Show or its creative process.

14. After solidifying the schedule for the Show's development, Defendant sent an email to Mr. Perel-Wertman, as well as Joel Wertman, Keith Stegall, Alan Kates and others. The content of that email was Alley's claim that he had purchased, without consultation with Plaintiff or its agents, and on his own, multiple memory cards and supposedly a huge amount of cloud storage space, asserting that he did so because he believed he would be needing by him for editing the Show. To be

clear, none of Plaintiff's agents had expressed any indication to Defendant Alley that he would edit the Show and Defendant's claim of his intention to edit the Show was merely his own assumption. When Defendant was advised that Plaintiff would be handling all of the filming, storage and editing of the Show's episodes, Defendant Alley replied: "This is not what I agreed to, you can count me out. No hard feelings, I'll pick up my stuff in the morning." Later, Plaintiff received another email from Defendant Alley, in which Defendant stated: "Sorry for losing my cool."

15. Thereafter, at the dress rehearsal prior to the first round of shooting for the Show, Mr. Perel-Wertman was present, as was Defendant Alley. Mr. Perel-Wertman observed the equipment and gear which Defendant had represented to be "state of the art and high quality." In reality, Defendant's equipment was decidedly lower quality than Defendant had represented. After exchanging pleasantries, Alley spoke to Mr. Perel-Wertman : "just so you guys are aware, we're going to be making a copy of all the footage you take on to our cards," referring to himself and Plaintiff Stegall. Mr. Perel-Wertman then confirmed that Defendant was not authorized to copy any of the filming of the Show, that under no circumstances would Plaintiff share raw footage with anyone, as "we never provide that for any of our shoots," and that Plaintiff truly is the exclusive owner of all of the intellectual property associated with the Show.

16. Later, Mr. Perel-Wertman advised Alley that "we will review the footage and when we're ready to share it, we will do that." Defendant responded by asking "who's we?" to which Defendant was advised "The Network that is broadcasting this show." Defendant responded by saying "Well that's what we're gonna do." Plaintiff Stegall then confirmed that Plaintiff "knows what they're doing" and Defendant reluctantly acceded to Plaintiff Stegall's request that Alley follow Plaintiff's direction, asserting: "Ok, but it was my understanding I'd be producing this show."

17. Upon inspection of the equipment which Defendant Alley had brought to the shoot, Plaintiff realized that Defendant's equipment was far below the quality Plaintiff needed and to which Plaintiff had access. Because of the inferior state of Defendant's equipment, which was the primary reason he was engaged in the first place, Plaintiff decided not to use Defendant Alley's equipment for the second round of shooting. Instead, Plaintiff replaced Defendant's outdated microphones and

cameras that were not formatted to shoot at the rate Plaintiff required, causing Plaintiff to have to reformat the other equipment Plaintiff was using and purchase new equipment. Intriguingly, when Plaintiff completed the first round of shooting in Muscle Shoals, Alabama, after loading out all the equipment and gear, Defendant literAlley sped off in his car without saying goodbye to anyone.

18. The second round of shooting began relatively smooth and without incident. While Defendant seemed to be assisting as desired, he nonetheless continued to insert himself into the scene during interviews. Again, in preparation for this round of shooting, Mr. Perel-Wertman decided that Plaintiff would not be using any of Alley's equipment, *i.e.*, his cameras and microphones. Defendant Alley continued to make comments about how he was happy to no longer have the responsibility of producing the show and that he was happy it was all on Plaintiff. However, on the final day of filming, September 23, 2024, and within ten minutes of his arrival, Mr. Perel-Wertman observed Defendant Alley drink from a flask in his hand. Walking past him, Defendant commented that "A little Jack," meaning Jack Daniels whiskey, "never hurt nobody." In attempting to stay on schedule on the last day of filming, Mr. Perel-Wertman elected not to say anything, although Alley's "day drinking" can only be described as unprofessional. Before filming began, Mr. Perel-Wertman was informed that Defendant had been "drinking a lot since he's been here." Mr. Perel-Wertman was later told from another colleague who was on set that day that Defendant's breath "reeked of whiskey from the minute he got to set." As the shooting commenced Alley pulled out his flask, on camera, and began to periodically take sips from it.

19. About halfway through the interview that day, Mr. Perel-Wertman noticed a GoPro sitting on his desk directed at Plaintiff Stegall and the guest, which was the primary focus of the interview. Mr. Perel-Wertman observed that the red light on Defendant's GoPro was flashing on, indicating it was recording. Because Plaintiff was in the middle of recording the interview, and the story was phenomenal, Mr. Perel-Wertman did not wish to stop the shoot in order to direct Defendant to get rid of his camera. Shortly after noticing Defendant's GoPro, camera, it began to beep so loudly that Plaintiff was forced to stop recordoing. Defendant Alley hurriedly took the camera off the table. When asked what he was recording, Defendant did not deny he was recording the same interview

which will be part of the Show, and therefore Plaintiff's intellectual property, Defendant falsely claimed that his GoPro was "dead."

20. Not wanting to delay the shooting any longer, particularly since Plaintiff Stegall and the guest were proceeding extremely well, Mr. Perel-Wertman approached Defendant Alley and asked him for the footage he had captured on his GoPro, since, again, anything captured on Defendants' equipment while filming the Show is Plaintiff's property. Shortly thereafter, Mr. Perel-Wertman asked Defendant if he was again recording on his GoPro camera. Defendant responded by saying "Oh you bet I was" recording the Show for his own benefit. Mr. Perel-Wertman then affirmed that "we're going to need that footage." Alley refused, asserting "well you can't have it, it's mine and you're going to have to deal with that." Despite Plaintiff's efforts to persuade Defendant Alley to return Plaintiff's intellectual property, Defendant then threatened Mr. Perel-Wertman with bodily violence if Mr. Perel-Wertman would attempt to retrieve Defendant's GoPro and the contents of Plaintiff's Show which Defendant had captured on any of his equipment.

21. The September 23, 2024 shoot ended with Defendant Alley still refusing to return to Plaintiff the video and audio contents of the Show which Defendant had been recording, without Plaintiff's permission, while Plaintiff was in the process of creating its own intellectual property, *i.e.*, the Show. Defendant then immediately started to pack up his monitor and leave. When asked what Defendant was doing, as there was still more shots to film that required him to be there, Defendant very angrily finished packing up his things and began to walk out. Defendant then stopped, approached Mr. Perel-Wertman and said "Shane, you can cut me out of everything since I know that's what you were going to do anyway. Count me out, I'm done. You have my blessing."

22. Notwithstanding his "conciliatory" representations to Plaintiff's representatives, including Shane Perel-Wertman, Plaintiff has learned that Defendants Alley and Does 1 through 5 have used, continue to use and threaten to continue to use Plaintiff's intellectual property, meaning recordings of the Show, its concept and the interviews by Plaintiff Stegall of his guests, which Defendant Alley admittedly captured on his equipment, unquestionably belongs exclusively to Plaintiff. Defendants' use of Plaintiff's intellectual property, including the Show, the images of

Plaintiff Stegall, his guests and the subject of their interviews, which Defendant Alley admittedly captured on his camera and equipment constitutes blatant infringement by Defendants Alley and Does 1 through 5 of Plaintiff's copyright under 17 U.S.C. section 501(a), *i.e.,* those who purposefully and knowingly use, and threaten to use, Plaintiff's intellectual property with knowledge of that their acts constitute infringement. At all times herein mentioned, Defendants have infringed upon Plaintiff's copyright. As such, Defendants are those who "violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118," or one "who imports copies or phonorecords in violation of section 602."

23. Pursuant to 17 U.S.C. § 504, Plaintiff is entitled to actual damages, including Defendants' profits, as will be proven at trial, and/or statutory damages, including attorneys' fees. Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiff irreparable injury that cannot be fully compensated or measured in monetary terms. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting the reproduction, distribution, sale, public performance or other use or exploitation of the Show, its concept and all of the infringing material which Defendants have managed to amass.

SECOND CLAIM FOR RELIEF

(For Intentional Interference with Contractual Relations, by Plaintiff GAIM Against All Defendants)

24. Plaintiff incorporates by reference each and every allegation asserted within paragraph nos. 1, 3 through 6 through 22, above.

25. Since the advent of Plaintiff's entering into its agreement with Plaintiff Stegall, Plaintiff has had an economic relationship with other third parties, such as the numerous television stations with whom Plaintiff distributes the audio/visual "content" and networks, such as Retro Television Network and Heartland Television. Long before Plaintiff entered into its agreement with Plaintiff Stegall to produce the Show, Plaintiff had developed very valuable and extensive relationships with

///

major distributors of viewer content, such as High Dollar Hill and the Heartland , of which Defendants had actual knowledge and were acutely aware.

26. As alleged above, Defendant has infringed upon Plaintiff' copyright, threatened Plaintiff's on-site personnel, including Shane Perel-Wertman, and falsely, and irrationally, claims some unarticulated ownership interest in Plaintiff's intellectual property, including the Show. Because Defendant has falsely asserted ownership interest in Plaintiff's intellectual property, Plaintiff's relationship with Plaintiff Stegall has been disrupted in that Defendants' elicit conduct has caused a interruption in the shooting and editing of the Show and Plaintiff's anticipated distribution of the Show to networks, such as the Heartland Network, which broadcast content to their viewers via satellite and/or cable.

27. As a direct and legal result of Defendants' intentional interference with Plaintiff's contractual relations, Plaintiff has sustained injury and damages in an amount that is ongoing and accruing in an amount as yet undetermined, to be determined at time of trial.

28. As a further direct and legal result of Defendants' intentional interference with Plaintiff's contractual relations, Plaintiff is entitled to an award of punitive damages, in an amount to be determined at time of trial.

THIRD CLAIM FOR RELIEF

(For Intentional Interference with Prospective Economic Interests),

Against All Defendants)

29. Plaintiff incorporates by reference each and every allegation asserted within paragraph nos. 1, 3, 4 and 6 through 21, above.

30. At all times herein relevant, Plaintiff has had economic relationships with third parties with which it has had the probability of future economic benefit to the plaintiff. Through conversations involving Plaintiff Stegall, Plaintiff has learned that Defendant is aware of those economic relationships.

///

31. As alleged above, Defendants have engaged extensively in conduct which, Plaintiff believes, is calculated and intended to disrupt. For example, Defendant Ally has infringed upon Plaintiff's intellectual property, including the Show, and threatened Plaintiff's personnel and the crew that has been working with Plaintiff to produce and exploit the Show, with physical violence.

32. As a direct and legal result of Defendants' intentional interference with Plaintiff's prospective economic interests, Plaintiff has sustained damages in an amount which is ongoing, unascertained, to be determined at time of trial.

WHEREFORE, Plaintiffs Get After It Media, Inc. and Keith Stegall pray for judgment in their favor and against Defendants Robert Ally and Does 1 through 5 as follows:

1. For compensatory damages in the sum of at least $5,000,000;
2. For injunctive relief enjoining and restraining Defendants Robert Ally and all persons acting in concert with him from marketing and selling, distributing or promoting any of their infringing works mimicking Plaintiff's intellectual property, and enjoining and restraining those Defendants and those working in concert with them from engaging in conduct that serves to threaten Plaintiffs, their business and businesses and their customers;
3. For injunctive relief;
4. For the allowable costs incurred by Plaintiff herein; and
5. For such other and further relief that is proper and just.

Dated: January 7, 2025

LAW OFFICE OF LAWRENCE P. HOUSE

By: ______________________

LAWRENCE P. HOUSE
Attorneys for Plaintiffs
GET AFTER IN MEDIA INC. and KEITH STEGALL